COMPTOGRAPH CO. v. BURROUGHS ADDING MACH. CO.

(Circuit Court, N. D. Illinois, E. D.   December 29, 1909.)

No. 29,538.

1. PATENTS (§ 211*)—LICENSES—CONSTRUCTION OF CONTRACT.

By a license contract between complainant as owner of a patent and defendant, an alleged infringer, complainant released defendant from all claims for past infringement, granted it a license for the full term of the patent, and agreed to bring suit against an infringer to establish the validity and scope of the patent, while defendant agreed to pay a sum in cash, a royalty on all machines made prior to the final decision in such infringement suit, not later than a stated time, and an increased royalty thereafter should such decision sustain the patent, with the privilege of terminating the contract should it be adverse. *Held*, that the effect of such contract, on the payment of the initial sum and the royalties to the stated time, was to vest defendant with license during the term of the patent as under an executed contract; the payment of further royalties, only, being contingent on the result of the suit.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 211.*]

2. PATENTS (§ 214*)—LICENSES—GROUNDS FOR CANCELLATION.

The fact that a licensee under a patent for the full term of its life under a contract which he has fully executed by payment of the agreed consideration, although he was to pay further royalties if the patent was sustained in an infringement suit brought by the licensor, by leave appeared in the appellate court in such suit and filed a brief in aid of the defendant, attacking the validity of the patent, which was adjudged void, does not entitle the licensor to a cancellation of the license contract.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 214.*]

In Equity.   Suit by the Comptograph Company against the Burroughs Adding Machine Company.   On demurrer and exceptions. Demurrer sustained, and bill dismissed.

John W. Munday, for complainant.
Robert H. Parkinson and Edward Rector, for defendant.

SANBORN, District Judge.   Hearing on demurrer and exceptions. This is the second suit between the parties, and is brought to cancel a license contract.   The first action was an ordinary infringement case on the Felt patent, No. 628,176, in which defendant pleaded the license. Issue was joined on the plea and testimony taken on the theory that defendant had by its conduct renounced the license, and that complainant had elected to accept such renunciation, thus in effect canceling the license by agreement.   The parties being citizens of different states, and the necessary jurisdictional amount being involved, this issue was properly triable in the infringement suit, and resulted in a decree dismissing the bill upon the ground that no agreed renunciation was shown, and that although there might be ground for a cancellation in court, until actually so adjudged the license still remained in force.

Comptograph Co. v. Burroughs Adding Machine Co. (in this court, 1909) 175 Fed. 787.

Thereupon this suit was brought in equity for the cancellation of the license upon the ground above indicated.

On January 20, 1904, the Arithmometer Company and the complainant entered into a license contract or agreement, a copy of which is attached to the bill. Subsequently the Burroughs Company, defendant, succeeded to all the Arithmometer Company's rights under the said license contract and was duly recognized as the licensee thereunder by the complainant. By this contract the licensor released from all claim for back damages or royalties, amounting to not less than $70,000, and granted a license to make, use, and sell the patented machine, exclusive of everybody except the licensor. For this the licensee was to pay a nominal royalty of $1 per machine, alleged to be about one-fourth of 1 per cent. of the selling price, during the pendency of a certain test suit which the contract required the licensor to bring against an infringer for the purpose of demonstrating and establishing the validity of the said patent and stopping infringement. If the test suit were successful, the contract required the licensee to pay a reasonable royalty of $10 and $5 per machine, in case the courts sustained the patent. In case it had been paid, it would have amounted to more than $100,000 for the first year. During the whole time it was paid, and including the $5,000 advance payment, it amounted to no more than $12,200, while the complainant paid out on account of such expenses the much larger sum of $14,521.

The material provisions of the license contract are as follows: In consideration of $5,000 paid down, complainant releases defendant's assignor from past infringements. It then grants the sole right, exclusive except as against the licensor, to make, use, and sell the patented invention during the full patent term (except as to certain mechanism not in question here). The licensor also agrees to promptly bring suit against existing and future infringers, and diligently and vigorously prosecute to a final determination, for the purpose of judicially determining the scope and validity of the patent, suppressing infringements, "and securing a monopoly of said invention to the parties hereto." Defendant's assignor agrees to pay royalties as follows: (a) On all machines made by it during the pendency of the first suit of the infringement litigation and prior to its final determination (but not later than December 31, 1905), $1 per machine. (b) On all machines made after a final determination of such first suit which should result in an adjudication establishing the validity and scope of the patent in such manner as to control and monopolize under it all adding machines employing transversely-movable wide-frame paper carriages, $10 per machine until the amount should reach $200,000, and $5 during the remainder of the patent term and any reissues and extensions. It further agrees to pay $10,000 prior to the final determination of the first suit, on account of the $10 royalty; the $5,000 paid down to be taken as part of the $10,000. The concluding paragraphs of the contract are as follows:

"(7) This contract is based upon the assumption that the aforesaid letters patent are good and valid in law, and that they can be and will be sustained

by the courts and given a construction which will secure to the parties hereto a substantial monopoly of the manufacture, use and sale of all adding machines employing a transversely-movable wide-frame paper carriage, and is to be construed and enforced between the parties accordingly, and if, as a final result of the litigation hereinbefore mentioned, or as a final result of any subsequent litigation upon said letters patent, said letters patent shall be declared invalid or shall be so construed by the court as to fail to substantially cover and control all adding machines employing such transversely-movable wide-frame paper carriages, then, and in such event, said second party shall have the right to surrender this agreement and license and be relieved of any further obligations thereunder.

"(8) Said second party shall not be precluded or estopped by the contract and license from manufacturing, using and selling adding machines which do not embody the invention described and claimed in said letters patent, as same may be adjudicated and construed by the courts, but shall at all times have the same right and liberty of manufacturing, using and selling machines not embodying said invention as have other persons not parties thereto."

The inducement to the license contract is thus stated in the bill:

"Your orator further shows unto your honors that the American Arithmometer Company, a Missouri corporation at St. Louis, Mo., and which was the predecessor of the Burroughs Adding Machine Company, the defendant herein, was in the year 1900 engaged in making and selling tabulating machines that were an infringement upon said letters patent to Felt, and were in that year notified by or on behalf of said Felt & Tarrant Manufacturing Company to desist from such infringement. But though a considerable correspondence was had in relation to the matter between the counsel for the two companies, no settlement was arrived at until after the ownership of the said patent to Felt passed to your orator, the said American Arithmometer Company continuing to make and sell the said infringing machines despite the protest and notice of the said Felt & Tarrant Manufacturing Company, and your orator, until some 7,000 machines had been made and sold in infringement of said patent. That machines of this kind are expensive, and these machines sold for more than $300 each, to wit, for $400 or thereabouts, and that a small royalty fee under the patent from a licensee ought not to be less than $10 per machine in any case, and had such a reasonable royalty been paid by the defendant and its predecessor on the said 7,000 machines it would have amounted to at least $70,000. Your orator further shows unto your honors that, so being the owner of the said letters patent to Felt, and so having notified the said American Arithmometer Company of the said infringement thereof, your orator entered into negotiation with said company looking to a settlement of the existing differences between them. And as a result of such negotiations your orator and the said company entered into a license agreement in writing signed and sealed by your orator and by the said American Arithmometer Company, and dated January 20, 1904."

Pursuant to the contract complainant brought suit April 19, 1904, in this court against Universal Adding Machine Company, impleaded as Universal Accountant Machine Company, for infringement of the Felt patent. This was the "first suit" referred to in the license, and was successful in the Circuit Court. 142 Fed. 539. Upon this decision being made, defendant caused the fact to be extensively advertised, and caused circulars to be printed warning users of the danger of buying the Universal Company's machine on account of infringement. This was against complainant's expressed wish. The Universal Company was thus very greatly injured and a large amount of its trade thereby diverted to the defendant, to its benefit, as complainant is informed and believes, $50,000. The case was taken to the Court of Appeals. 146 Fed. 981, 77 C. C. A. 227.

The conduct of the defendant which it is alleged was a repudiation of the Felt patent by it, accepted by complainant, is thus stated in the bill:

"The said Burroughs Company, defendant herein, appeared in said Court of Appeals by its director and counsel, Mr. Edward Rector, after it had been urgently requested by your orator not to do so, and against your orator's protest and opposition, asked for and obtained leave, as a pretended friend of the court, to file, and did on April 16, 1906, file on behalf of the said Burroughs Company, in said suit of your orator against said Universal Company, a certain brief amicus curiæ. That in said brief the Burroughs Company told the court that it was interested in the litigation, since, if the Felt patent were sustained, it would, under the increased rate of royalty due in case the monopoly was secured, be obliged to pay upwards of $100,000 in the first year after such increase went into effect, at the rate it was then manufacturing machines. And in said brief the said Burroughs Company repudiated the said Felt patent as void and invalid and of no effect for various reasons, and asked the court to so hold, and told the court that the Burroughs Company held an independent and adverse title to said invention, hostile to your orator's title thereto, and by virtue of a separate and distinct patent grant, namely, by virtue of a certain patent, No. 595,864, dated December 21, 1897, granted to one William H. Pike, Jr., which patent was owned by said Burroughs Company; and did further represent in said brief that Felt had abandoned his invention to the said Pike or other subsequent inventors; and further that the machine built by said Felt early in 1890, and containing the invention, was merely an abandoned experiment and could not serve as a foundation for the date of his invention as against said subsequent inventors; and further in and by said brief did furnish to said Court of Appeals, in aid of the infringer, said Universal Company, much in the way of apt argument and suggestion and many points and authorities and which, as your orator is informed and believes, had great influence upon said court in causing it to decide adversely to your orator as said court did upon an insufficient record and without knowing the real facts; and did in said brief represent to said Court of Appeals that said Felt, from early in the year 1890 to May, 1898, a period of eight years, did nothing looking to the putting of his said invention into the possession of the public."

The appeal resulted in a reversal, with direction to dismiss the bill. On the day of the hearing in the Court of Appeals, April 16, 1906, complainant elected to accept the situation thus created by defendant, and immediately notified it that complainant considered the license at an end, and that it should regard defendant as an infringer if it persisted in making infringing machines in the future; and complainant repeated this notification by registered letter to defendant January 7, 1907. For more than a year thereafter defendant kept silent under such notice, and thus led complainant to believe that it had given up the license, but later, and in the infringement suit against it, defendant set up the license agreement as a defense. As already stated, its plea of license was sustained, whereupon this action to cancel the license was brought.

It was held in the former suit between these parties that there was no cancellation of the contract by agreement, that it was still in force and a good defense in bar, and would so continue until set aside in a suit brought for that purpose. The questions now presented are the proper construction of the license contract, and whether the conduct of defendant authorizes its cancellation.

The proper construction of the license contract I think is that the $5,000 paid down was for a release of any possible damages and profits on adding machines made by the licensee up to a time coincident

substantially with the making of the contract, and that the agreement to pay a dollar a machine after that time pending the first suit to test the patent, but not later than December 31, 1905, if the suit should be decided after that date, was the consideration for the license to make, use, and sell the patented invention from January 1, 1904, to the end of the patent term. These license fees were fully paid. If the test suit should be successful, the licensee was to pay an increased royalty; otherwise no further sum was to become due. Therefore this grant of the right to make, use, and sell was made for the payments made up to December 31, 1905. The sum to be paid was its consideration. In a certain event the price was to increase; in another to remain as it was. Thus the price was contingent, not the grant itself. That was to remain vested forever, whatever might happen to the lawsuit. The patent estate or right which the licensee bought and paid for was by no means contingent or conditional, but vested and absolute. No condition whatever, subsequent or otherwise, attached to it. All that was conditional was the price to be paid for the transferred property right. So defendant is the owner of that right, unless it may be divested by this suit, by reason of the alleged forfeiture growing out of its attack on complainant's right to a decree in the Universal Case. Clearly the contract became an executed one after the money was paid. The title to the invention had passed, at a certain price. That price, it is true, was subject to change, upon the contingency of the patent being sustained. If that event did not happen, both title and price were to remain the same.

It is not unusual to insert in a patent license a provision that the royalty shall cease if it shall at any time be "judicially decided" that the patent is void or does not secure the monopoly. Such clauses are inserted on the assumption that the licensee, when sued for royalty, is estopped to deny the validity of the patent, and to give him the benefit of litigation by or against third persons, notwithstanding that rule. United States v. Harvey Steel Co., 196 U. S. 310, 25 Sup. Ct. 240, 49 L. Ed. 492. And such a clause has been held to mean a decision by the Circuit Court of Appeals, and not one by the Circuit Court, where an appeal is promptly taken. Critcher v. Linker (C. C.) 169 Fed. 653.

As already suggested in the opinion in the former case between the same parties, brought for infringement of the Felt patent, but which was dismissed because of the license contract, a person may not make an agreement upon condition, and then escape obligation by preventing the happening of the condition. If the obligation would have arisen but for the act of the person to be charged with it, the contingency is deemed to have happened, and the liability is complete. But the defendant did not prevent the complainant's winning the Universal Case. The adverse decision was because the record showed the patent void. Defendant helped to procure that result, but the proximate cause of that consequence was the state of the record, not the brief and argument of defendant. Even though it were demonstrable (though it cannot be in the nature of things) that the decision would have been otherwise but for defendant's action, still that result was the proximate legal consequence of the record, by which the adverse judgment was

compelled. Suppose the Universal Company had defaulted in the Court of Appeals, and that affirmance would have resulted but for defendant getting heard and showing the state of the record. Even then the result would be clearly traceable to the record, and to that alone.

This conclusion has not been reached without much study and reflection, after very full and able argument on both sides, and it may therefore be well to consider the point further. The case was brought by complainant against the Universal Company alone. Defendant neither was, nor could properly be, a party. Yet it had a very great interest in the suit, probably much more than the Universal Company, because a result adverse to complainant might, and probably would, release it from a quarter of a million royalty. If complainant had sued defendant for royalty, or for infringement in using that part of the invention reserved from the grant, or for some other reason, defendant could not have been heard to attack the validity of the patent. A licensor is entitled to the silence of the licensee respecting the validity and prima facie scope of the patent, as held by the Circuit Court of Appeals of this circuit in Indiana Manufacturing Company v. J. I. Case Threshing Machine Company, 154 Fed. 365, 83 C. C. A. 313. How does it happen then that the licensee must keep still when sued directly, but may attack the validity of the patent when the suit is against another, and the licensee is permitted quasi intervention by reason of its vital interest? In both cases the parties are antagonists. The Comptograph Company is substantially complainant, and the Burroughs Company defendant, in one case equally with the other. Both parties have very large and exceedingly valuable interests. Why should the Burroughs Company be completely estopped in one case and not in the other? It used its position and interest as licensee under the Comptograph Company to get into the Court of Appeals, only to attack the very title by which it claimed that interest. It asserted complainant's title to be sufficient to give it a standing in that court, but not sufficient to give any protection to complainant. Why should not a person be precluded from taking such an inconsistent and apparently unfair position?

The answer is that defendant was permitted to do all this by the Court of Appeals, that the doing of it did not injure complainant, and that a licensee's duty to maintain silence is not one of completely perfect obligation. Suppose he is sued for infringement and claims a license; but, deeming his right to the license not entirely clear, he pleads nonpatentability, or prior public use, thus attacking the patent. The court sustains the patent but finds defendant a licensee. It would seem clear that the conduct of the defendant in thus repudiating the license would not justify its cancellation. This question has not been adjudicated, but the case supposed occurred in Lane & Bodley Co. v. Locke, 150 U. S. 193, 14 Sup. Ct. 78, 37 L. Ed. 1049. The licensee may buy in a hostile patent to save himself from litigation, and better his estate. No harm results to the licensor so long as the license is respected. It seems to be true, indeed, that a grantee cannot assert that the title obtained from his contestant is sufficient for his own protection but not available to that contestant. Robertson v. Pickrell,

109 U. S. 608, 3 Sup. Ct. 407, 27 L. Ed. 1049. The Burroughs Company got into court in the Universal Case by virtue of the title obtained by it through the license, and at once took the position that that very title was not available to the licensor, its opponent in that case. It seems that the Circuit Court of Appeals might properly have denied it the right to do this. Bybee v. Oregon & California R. Co., 139 U. S. 663, 11 Sup. Ct. 641, 35 L. Ed. 305. But the question was not only one for that court alone, especially in view of its great interest in having the fullest possible presentation of the case, but the decision avoiding the patent did not result from such permission, or from defendant's argument, but from the state of the record in that suit. Complainant could not maintain an action for damages for such act of defendant, so permitted by the court of last resort, because it was thus made a perfectly lawful act, and because no harm resulted from it; the result being due to another cause. When the Court of Appeals allowed defendant to file the brief and argue the appeal, those acts were absolutely legalized and rendered entirely innocent and proper, especially as the defendant is not charged with fraud or any misrepresentation whatever.

If an executed contract or transfer of property rights can be rescinded under any circumstances for breaches by the grantee, the case must be of the clearest possible character, and the damage direct and undoubted. Rutland Marble Co. v. Ripley, 10 Wall. 399, 19 L. Ed. 555; Kauffman v. Raeder, 108 Fed. 171, 47 C. C. A. 278, 54 L. R. A. 247. Canceling an executed contract is "an exertion of the most extraordinary power of a court of equity." Atlantic Delaine Co. v. James, 94 U. S. 207, 24 L. Ed. 112; Electric Goods Mfg. Co. v. Koltonski (C. C.) 171 Fed. 550. Certainly a cancellation cannot be made by reason of an act expressly authorized by a court of last resort, and thus legalized in the clearest and most emphatic way. No right of repudiation was expressly reserved in the license under consideration. If any such right exists, under any state of facts, it results only from some implied condition of the contract. A right of surrender is expressly reserved to the licensee, in a certain event, thus tending to negative any corresponding right of the licensor (Guyot v. Thomson, infra), especially in an executed contract. It has been held in the House of Lords that a patent license is irrevocable, in the absence of a reservation of the right, and that the licensor is confined to an action for damages, or, in a proper case, an injunction. Guyot v. Thomson, 64 L. J. Ch. 32, 3 L. R. Ch. Div. 388, 8 Reports, 814, 71 L. T. (N. S.) 416. The law is otherwise in this country as to executory contracts of license. Hartell v. Tilghman, 99 U. S. 547, 555, 25 L. Ed. 357; Standard Dental Mfg. Co. v. National Tooth Co. (C. C.) 95 Fed. 291; Comptograph Co. v. Burroughs Adding Machine Co. (in this court, 1909) 175 Fed. 787. As to such licenses no doubt the licensee might assume such a hostile attitude towards the patent as to show a disclaimer or repudiation of the license, and which, if accepted by the licensor, might amount to an agreement of surrender, operative immediately. Wood v. Wells, 6 Fish. Pat. Cas. 382, Fed. Cas. No. 17,-967. But it seems that even such an agreed repudiation would not

affect interests already vested in the licensee. Nor is there anything to show any intention to renounce the license contract on the part of the defendant. In the Court of Appeals it took the position that because it was a licensee, and thus had a vital interest in the litigation, it was in a position to attack the patent. In this way it insisted on the license, which it now claims gave it the right to do what it did. There is nothing in this from which a voluntary repudiation can properly be inferred.

There was much argument on the hearing to the effect that it would have been against public policy to imply an agreement by defendant not to contest complainant's right to the extent of abstaining from calling attention to facts in the record of the Universal Case which, if noticed, would compel a decision against the patent. This position finds some support in Pope Mfg. Co. v. Gormully & J. Mfg. Co., 144 U. S. 248, 12 Sup. Ct. 641, 36 L. Ed. 423, although in that case it was the agreement to keep silence after the license expired which was condemned; and the case was distinguished on that ground by Judge Grosscup in Philadelphia Creamery Co. v. Davis & Rankin Bldg. & M. Co. (C. C.) 77 Fed. 879; Consolidated Rubber Tire Wheel Co. v. Finley Rubber Tire Co. (C. C.) 116 Fed. 629, 638.

As to the exceptions to the bill on the ground of immaterial matter, some of the averments are not strictly material to complainant's case. But it should have the greatest possible opportunity of presenting its theory of repudiation, and its right to relief, and I have therefore thought best to overrule all of them.

The exceptions will be overruled, and the demurrer sustained.

